Moncure, P.,
delivered the opinion of the court.
This is a ease of novelty, not only on account of the nature of the proceeding, but of the questions which it involves. It is a case of prohibition, brought in this court as a court of original jurisdiction. By the constitution, article VT, § 2, this court is invested with “ appellate jurisdiction only, except in cases of habeas corpus, mandamus and prohibition.” And this provision of the constitution in regard to mandamus and prohibition, is carried into effect by chapter 160, § 4 of the Code, as amended by the act approved June 23, 1870, Acts of Assembly, 1869-70, page 219, chap. 171, which declares that “ the said Supreme court, besides having jurisdiction of all such matters as are now pending therein, shall have jurisdiction to issue writs of mandamus and prohibition to the Circuit and Corporation courts, and to the Hustings court and the Chancery court of the city of Richmond, and in all other cases in which it may be necessary to prevent a failure of justice, in which a mandamus may issue, according to the principles of the common law. The practice and *496 proceedings upon such writs shall he governed and regulated in all cases by the principles and practice ■ now prevailing in respect to writs of mandamus and prohibition, respectively.”
This is the second case of prohibition that has ever been brought in this court, as a court of original jurisdiction; the first being that of Ellyson ex parte, brought and decided within the last year. Supra p. 10. There have been several cases before this court as an appellate court. The first of which was Mayo, mayor, &c. v. James, 12 Gratt. 17; since which are the cases of Warwick, &c. v. Mayo, 15 Id. 528; and West v. Ferguson, 16 Id. 270. There were several cases before the General court during its existence. Miller v. Marshall, 1 Va. Cas. 158; Hutson v. Lowry, 2 Id. 42; and Jackson v. Maxwell, Id. 636. The questions upon the merits involved in this case, relate to the nature and extent of the powers and duties of boards of supervisors of the counties, under the constitution and laws of the State. In order that all the questions arising in the case may be properly presented and well understood, we deem it necessary to set forth, substantially, the proceedings which have been had in the case.
During the present term of this court, to wit: on the 9th day of March, 1871, “ the board of supervisors of the county of Culpeper,” by their counsel, presented a petition to this court, representing, in substance, that, by the laws of the State, they have sole control, power and care of and over all the corporate property of said county, and where none exists they are required to procure and provide all such as may be necessary; that when they came into their said office, they found that the courthouse, the jail, the clerk’s office, and most of the public square, on which said buildings had stood, had all been sold, and the buildings themselves torn down and removed; that finding the portion of the lot remaining undisposed of insufficient and wholly made *497 quate for the county purposes, they proceeded, in accordance with a decision of this court upon their powers in this matter, to sell the balance of said lot, and from the proceeds of these sales realized some $18,000; that then, by virtue of their aforesaid powers, and in discharge of their aforesaid duties, they proceeded to select other suitable ground, and to commence thereupon the buildings required of them by law; that they selected a most suitable and proper spot within the corporation of the town of Culpeper, and, thinking it most prudent, called upon the county court, in accordance with the general provisions relating to corporations, council of towns, &c., to have the damages assessed and the title perfected; that legal notice was given to the tenants of the freehold, and commissioners were appointed, who legally discharged their duties and made their report to the said court. Whereupon sundry citizens, by name “Joseph B. G-orrell,” &e. (eight in number, naming them), styling themselves “ citizens, tax-payers and real estate owners,” who had entered into a conspiracy for the purpose of hindering and harassing the said board in the discharge of their said duty, and for selfish purposes to compel your petitioners to put these public buildings on lots adjoining and adjacent to their stores and other property, came into the said court, offered to make themselves parties on the record, and asked leave to file sundry formal exceptions to the report of said commissioners, denying the powers of the said hoard, &c.; that the said court refused to hear them in this manner, and confirmed the said report, and condemned the lot therein described; that thereupon they appealed to His Honor, Henry Shackelford, judge of the Circuit court of Culpeper county, who granted them an order of supersedeas; the effect of which has been to arrest and delay them in the discharge of their duties and powers aforesaid. Bor the verification and more full explanation of all *498 these statements, reference is made to an official copy of the record, which is marked “A” and filed with the petition as a part thereof.
The petitioners further aver, that prior to the said order of Judge Shackelford they had entered into a contract for the erection of the aforesaid buildings, by which the county became liable to pay between eighteen and nineteen thousand dollars by the first day of July, 1872; that the contractor is now at work under said contract, and unless something is speedily done to prevent, the said county will become liable to heavy damages for her failure under her contract. They say they are advised that the said Judge Shackelford had no jurisdiction in this matter; because the power to do whatever is necessary in relation to corporate property is given by law to' the board of supervisors, without any right of appeal, except as therein specified; and because, if this were not so, these persons aforesaid, not being parties, could not appeal, so as to give Judge Shackelford jurisdiction; and further, that if he had any jurisdiction, it was only as to the amount of the damages, the law having denied him all jurisdiction to stop said public work. They therefore pray this court to award a writ of prohibition against the said Henry Shackelford, judge as aforesaid, and the said Joseph B. Gorrell, and other persons named as aforesaid, commanding them to proceed no further under the aforesaid order; and that the latter shall not further plead, and the former shall not further entertain, any pleas in ■and upon the matters aforementioned.
Annexed to the petition is an affidavit of the truth of the facts therein stated, made by Thomas B. Halle, who appears to he chairman of the board of supervisors.
Hpon the presentation of the said petition, it was ordered by this court that a rule he issued against the said Joseph B. Gorrell and the other persons com *499 plained of therein, including the said Henry Shackle-ford, judge of the Circuit court of Culpeper county, to appear here on the 17th day of March, 1871, and shew cause why a writ of prohibition should not be awarded against them, according to the prayer of the said petition.
The rule was accordingly issued, and service thereof was duly acknowledged by all the persons against whom it was entered. On the return day of the rule, to wit, the 17th day of March, 1871, three of the said persons, to wit, Charles Waite, John G. Miller, and the Hon. Henry Shackleford, failed to appear, as required by the rule. The other six of the said persons, to wit, Joseph 33. Gorrell, Lewis P. Helson, Edward 33. Hill, E. 13. Johnson, J. H. Armstrong and Thomas S. Alcocke, appeared by counsel and filed an answer to the said petition and rule. After saving all benefit of exception and demurrer to the said petition and the affidavit of Thomas 33. Halle, thereto annexed, the respondents, in their answer, say, it is not true, as alleged in said petition, “that when they (the said supervisors) came into their said office they found that the courthouse, the jail, the clerk’s office, and most of the public square on which said buildings had stood, had all been sold, and the buildings themselves torn down and removed.” On the contrary, no part of the clerk’s office has been torn down or removed, but is now, and has been, continuously used as such, for a period of not less than half a century; that the portion of the public lot remaining unsold when the said supervisors came into office, was amply sufficient for the erection of a new courthouse and jail; that the nearest of the lots sold off theretofore is more than eighty feet distant from the site of the old courthouse; that it is not true that the said supervisors have sold the balance of said public lot; on the contrary, a portion of the said public lot remains to this day unsold; that it is not *500 true that the said supervisors realized from the sales made by them some $18,000; on the contrary, all the ■ cash they have received from said sales is $425, out of' which-they have paid sundry charges and expenses of sale. The credit instalments of said sales amount only to the sum of $4,875, no part of which is yet due. It is not true that they selected other suitable ground and commenced thereupon the buildings required of them by law; on the contrary, the lot selected by them is not suitable, nor have they, to this day, commenced any buildings thereupon, nor has any material for building been deposited on said lot, to give the slightest color to said allegation. It is not true that legal notice was-given in the jn’oceedings to condemn said lot to the tenants of the freehold; on the contrary, no notice-whatever was given to any tenant of the freehold, nor did the commissioners appointed to assess the damages-proceed according to law in order to pass the title to-said lot; that said respondents are citizens, tax-payers and real estate owners within the county of Culpeper; that it is not true that they had entered into a conspiracy for the purpose of hindering and harrassing said board in the discharge of their duties, and for selfish-purposes, to compel said board to put the public buildings on lots adjoining and adjacent to their own stores, and other property; on the contrary, the steps they have taken were taken to prevent, by an appeal to the. law, public .officers from proceeding contrary to law, to prevent their own money to be raised by taxation and otherwise, from being expended on a lot to which no title would be acquired by the proceedings in the County court; that it is true these respondents came, into the- County court of Culpeper, offered to make themselves parties on the record, and asked leave to file sundry., exceptions to the confirmation of the report of said commissioners; and that said court refused to allow them to show cause against the confir *501 mation of said report, but confirmed said report without hearing them; and that they obtained from Judge Shackleford a supersedeas to said order of the County ■court. They insist that the Circuit court of Culpeper has jurisdiction in the premises, and they pray that the [said rule may be discharged. If, however, this •court shall be of opinion that said rule ought not to be discharged, then they insist that the said petitioners be required to proceed regularly, and to declare in prohibition.
The answer is supported by an affidavit of the respondents, thereto annexed, of the truth of the facts therein stated.
On the filing of the said answer, the respondents, by their counsel, moved to discharge the said rule; and the cause thereupon came on to be heard upon the said petition and the said motion, and was argued by counsel; on consideration whereof, the court is of opinion as follows:
I. The first question which arises in this case is, as to the powers of the board of supervisors of a county, under the constitution and laws of the State; and whether they have power, to acquire land; and if so, in what mode, for the erection thereon of a court-house, •clerk’s office and jail, and for other public county purposes.
The office of supervisor was unknown to the constitution and laws of Virginia until the adoption of the present constitution, which went into effect during the last year. It results from the system of county organization, taken, substantially, from the constitutions of some of the northern and north-western States, and engrafted upon our constitution.
The provision of the constitution which relates to the subject is the second section of the seventh article; which, so far as it is material to be stated, is as follows :
*502 “Each county of the State shall he divided into so> many compactly-located townships as may be necessary, not less than three,” &c. “The supervisors of each township shall constitute the board of supervisors, for that county; and shall assemble at the court-house thereof on the first Monday in December in each year* and proceed to audit the accounts of said county, examine the books of the assessors, regulate and equalize the valuation of property, fix the county levies for the ensuing year, apportion the same among the various townships, and perform such other duties as shall be prescribed by law.” Acts of Assembly 1869-70, p.. 624.
In the act appi’oved July 11, 1870, entitled “An act prescribing the duties and compensation of certain township officers,” Id. page 269, chap. 188, are the following, among other provisions:
“ 5. The board of supervisors of each county in this State shall have power at the meeting on the first Monday in December in each year:
“First. To audit the accounts of the county; to settle with the county treasurer his accounts for the year, in the manner prescribed by law; to settle with the sheriff his accounts upon the collection of fines or other-monies accruing and belonging to the county; to receive, audit and approve the report and accounts of the superintendent of the poor; and, generally, to settle with any other officer who may have an account with the county, and to take such steps as may be necessary to secure a full and satisfactory exhibit and settlement of the affairs of the county.
“Second. To examine the books of the assessors and regulate and equalize the valuation of property.
“Third. To fix the county levies for the ensuing year, upon the information afforded by the above settlements, and to apportion- the same among the various townships of the county.
*503 “ 6. The said board of supervisors of each county of the State shall have power, at said meeting in December, or at any other legal meeting:
“First. To make such orders concerning the corporate property of the county as they may deem expedient.
“ Second. To examine, settle and allow all accounts chargeable against such county, and when so settled they may issue county warrants therefor, as provided by law. But the board of supervisors of any county shall not issue in any one year a greater amount of county warrants than the amount of the county tax levied in such county for such year; and no interest shall ever be paid by any county on any county order.
“Third. To build and keep in repair county buildings.
“Fourth. To cause the county buildings to be insured in the name of the board of supervisors of said county and their successors in office, for the benefit of the county, if they shall deem it expedient; and in case there are no public buildings, to provide suitable rooms for county purposes.
“Fifth. To direct the raising of such sums of money as may be necessary to defray the county charges ánd expenses, and all necessary charges incident to or arising from the execution of their lawful authority, if the same has not been provided for at the December meeting, and is necessary under the circumstances.
“ Sixth. To represent the county, and to have the care of the county property, and the management of the business and concerns of the county in all cases where no other provision shall be made.
“ Seventh. To perform all other acts and duties which may be authorized and required by law, not embraced in this act.”
It will thus be perceived that, under our new internal organization of the State, the most important pow *504 ers and duties, in regard to the police and property of the counties, are devolved on the boards of supervisors thereof respectively. The first section of the act referred to makes them a quasi corporation, with capacity to sue and to be sued. The seventh section declares that they may have a seal; that they shall sit with open doors, and that all persons conducting themselves in an orderly manner may attend their meetings. By subsequent sections, the attorney for the Commonwealth is required to represent the county before the board of supervisors, who are clothed with important judicial functions, and from whose decisions only a limited right of appeal is allowed. The 20th section provides for their compensation and travelling expenses; and. the 21st section requires them to give bonds conditioned for the faithful discharge of their duties; and for any violation of the condition thereof makes them and their sureties liable thereon for damages to any party injured thereby, and subjects them to a penalty for refusing or neglecting, without just cause, to perform any of their official duties. The supervisors are to be elected annually by their respective townships; and looking to the great importance of their office, and the deep interest which the people have in its faithful execution, it may fairly be presumed that the most intelligent, discreet and virtuous men, in the community in which they live, will be elected to the office, and that if any of them should turn out to be unfaithful or unfit, they will not be reelected.
Having made these general observations in regard to the powers of the board of supervisors, under the constitution and laws of the State, let us now proceed to the particular enquiry with which the question under consideration closes; that is: whether they have power to acquire land, and if so, in what mode, for the erection thereon of a court-house, clerk’s office and jail, and for other public purposes of the county.
*505 And, in the first place, have they power to acquire land for those purposes ?
Ho express power is given them to acquire land for any purpose. But power is expressly given them “to build and keep in repair county buildings;” “and, in ease there are no public buildings, to provide suitable rooms for county purposes;” and “ to represent the county and to have the care of the county property, and the management of the business and concerns of the county, in all cases where no other provision shall be made.” How can they discharge these express powers and duties, without the power to acquire land? Suppose a county is without a courthouse, clerk’s office or jail, and without ground on which to build them: how are the board of supervisors to perform their express power and duty in such a case, “to build and keep in repair county buildings,” without first acquiring the ground on which to erect these necessary buildings ? The implied power to acquire the ground is as plainly given as the express power to erect the buildings. In the construction of the most naked powers, to which the strictest rules of construction are ■applied, there is no better settled rule than this, that every power necessary to the execution of an express power is plainly implied.
But this very question has, in effect, been settled by a unanimous decision of this court, in a recent case, to which the board of supervisors of the county of Culpeper were parties. Robert D. Keerl, and four other citizens of said county, obtained an injunction to restrain the said board of supervisors from selling the land on which the public buildings of the county were standing; upon the ground, alleged in the bill, that the said board had no power to sell or convey said public lot, or any portion thereof; that the fee simple title to the land was in the county; and that the said Id oar d had no title, and could pass none whatever, to *506 the property. Upon the answer of the board of supervisors, claiming power by law to sell the property, the- • injunction was dissolved by Judge Shackleford. An application was made to this court by the plaintiffs, for an appeal from the said order of dissolution. And on the 9th day of November, 1870, this court, being of' opinion that the said order was plainly right, refused to grant such appeal.
Now, there is no express power to sell the land given by law to the board of supervisors, any more than express power given them to acquire land. The power-to sell land in the case referred to was implied, chiefly from the express power “ to make such orders concerning the corporate property of the county as they may deem expedient.” The implication in this case, of the power to acquire land, seems to be stronger, if' possible, than the implication in that case of the power-to sell land. After the exercise of the power of sale,, which was accorded to them in that case, the power to-acquire land became indispensably necessary to the exercise of the express power “ to build and keep in repair county buildings.” ■
It is argued by the counsel for the defendants, that-the power to acquire land, on which to erect the public buildings of the county, when necessary, is vested by law in the county court, instead of the board of supervisors of such county. He cites, in support of that argument, chapter 50, § 1 of the Code, which declares, that “ there shall be provided by the court of every county, and by the council of each town wherein there-is a corporation court, a courthouse, clerk’s office and jail; the cost whereof, and of the land on which they-may be,- and qf keeping the same in good order, shall be chargeable to the county or corporation, and may be levied for by such court or council. The fee simple-of the land shall be in the county or corporation, and the court thereof may purchase so much land as, with *507 what it may before have had, will make two acres, whereof what may be necessary shall be occupied with the courthouse, clerk’s office and jail, and the residue planted with trees, and kept as a place for the people of the county to meet and confer together.” And he contends that this law has not been altered by subsequent legislation, but, on the contrary, has been thereby continued in force. In proof of which, he cites chapter 38, § 3, of the act approved April 2, 1870, which declares that “the powers, duties, authority and jurisdictiosi of said courts (the County courts), shall be and continue as now provided by law, except in so far as the same are modified by the constitution of the State.” And he contends that it was by design, and for a reasonable purpose, as well as in accordance with the plan of the Legislature in other similar cases, to vest powers in reference to the same subject in different agents, so as to operate as salutary checks and balances.
We think the effect in this case would be more likely to produce discord and embarrassment where unity and concert are eminently required. ¥e think that the whole law on this subject must be construed together; that the act just cited must be viewed in connection with the act subsequently passed during the same session of the Legislature, prescribing the powers and duties of the board of supervisors; Id. 269; and, when there is any conflict between the two, the act posterior in date must prevail. According to this rule of construction, the power of the board of supervisors to acquire la3id for the purposes aforesaid, is, we think, plainly implied.
And now the question comes up, How is the acquisition to be made ?
Of course it may be made by purchase, in the ordinary way of acquiring title to land. But to make a purchase, it is necessary that the owner of the land ' should be competent to sell it, and willing to do so, on *508 terms which the purchaser may he willing to accept. If the owner he under a disability, as, for instance, be an infant or a feme covert, or be unwilling to sell on terms on which the person wishing to make the purchase is willing to buy, then, to acquire title to the land, some other means must be resorted to than an ordinary contract of purchase and sale between competent parties.
Such appears to have been the case here. The owners, or some of them, of the land selected by the board of supervisors for the location of the county buildings of Culpeper, were under disability, and the board of supervisors thought it necessary or proper to resort to legal proceedings to acquire title to the said land. They accordingly proceeded in the mode prescribed by the Code, chapter 56, §§ 6-16, pp. 324-326. The 6th section provides, that, “ If the president and directors of a company incorporated for a work of internal improvement, the court of a county, or the council of a town, cannot agree on the terms of purchase with those entitled to lands wanted for the purposes of the company, county or town, five disinterested freeholders shall, be appointed by the court of the county or corporation in which such land, or the greater part thereof shall lie (any three of whom may act), for the purpose of ascertaining a just compensation for such land.” The remaining sections referred to prescribe whatever else is to be done to complete the acquisition of the property.
These provisions of law are not confined to cases in which competent contracting parties cannot agree on the terms of purchase, but extend also to cases in which there can be no such agreement, on account of the disability of any of the owners, or otherwise. .
But it is argued that these provisions authorize the court of a county to . acquire title to land in the mode *509 and for the purposes thereby prescribed, but not the board of supervisors of a county.
We think that the board of supervisors of a county being now exclusively invested by the constitution and laws of the State, as we have already shewn, with the power and duty of providing public buildings for such county, and procuring the necessary land for that purpose, it follows, as a necessary consequence, that they must have power to proceed in the mode prescribed by the provisions aforesaid; that being the only mode whereby a good title can be acquired to the land selected by them for the location of the public buildings of the county. "It was surely not designed to take away from a county the right it had to select the most suitable location for its public buildings, without regard to the ownership of the land, and to confine it to such a location only as could be acquired by agreement with the owner. These provisions . authorized the County court to institute proceedings for the condemnation of land for county purposes, because that court was then the agent of the county for providing county buildings, and procuring the necessary land for that purpose. But the new constitution and laws having created another agency for the purpose, and having transferred the duty of providing county buildings and procuring land for the purpose, from the county court to_ the board of supervisors, these new agents have implied power to use the means provided by law for the condemnation of land, when necessary to enable them to discharge that duty. The power to acquire land by purchase, and the power to acquire it by condemnation for county purposes, ought to be in the hands of the same agent. And as the former is now in the hands of the board of supervisors, it is fair to presume that it was intended to place the latter there also.
The board of supervisors of the county of Culpeper *510 had power, therefore, to acquire title to the land selected by them for the location of the public buildings of the county in the mode prescribed by the provisions aforesaid. And we proceed to consider the next question arising in this case, which is,
Ü. "What is the nature of the proceeding instituted by pbe said board of supervisors for the condemnation of the said land, and had the defendants in this cause a right to appear and show cause against the confirmation of the report as they proposed to do in that case?
The proper mode of acquiring title to land which is needed for public purposes, is to purchase it in the ordinary way, if that can be done on reasonable terms. But if that cannot be done, the only other mode which can be pursued is the one prescribed by the 56th chapter of the Code, which was pursued in this case. The provisions of that chapter which relate to this subject are those embraced in sections 6-16, pp. 324-’5 and ’6. Their only object is to ascertain the value of the land and to vest the title thereto in the public for the purposes for which it is needed. They do not involve any question as to the propriety of the selection made by the board of supervisors, when they are the parties proposing to condemn the land. That is a question which the law refers to their discretion only; and whe-fcher that discretion be wisely or unwisely exercised in the selection made by them, cannot be enquired into in the proceeding instituted to condemn the land. They can select any land which they think most suitable for the purpose for which it is needed, no matter who owns the land, nor whether he be willing to part with it or not, nor whether he be under a disability or not, nor whether he be a resident of the country or not, nor whether the title be in controversy or under a ■cloud or not. The eminent domain of the Commonwealth exists in all the land within her limits, and is ■jprior and paramount to the title of any individual; *511 and it is in virtue of that right of eminent domain, that land is taken for public purposes. The law has provided the most summary and simple mode of pro- ■ ceeding to acquire title to the land, and at the same time has taken special care to secure just compensation to the owner. One chief object of the law is to avoid delay and to secure to the public the immediate and uninterrupted possession and use of the land. Bive disinterested freeholders (any three of whom may act), are to be appointed by the court of the county in which the land shall lie, for the purpose of ascertaining a just compensation for such land. § 6. It is not necessary, as in the case of a chancery suit, to convene all persons interested in the subject as parties to the proceeding. It is not even necessary, in all cases, to .give any notice of the proceeding to the owner of the land. “"When it is intended to apply for such appointment (of freeholders) ten days previous notice thereof shall be served on the tenant of the freehold, or his .guardian or committee. But if there be no such tenant, guardian or committed within the county or corporation, the notice, instead of being thus served, may be published once a week, for four weeks, in some convenient paper, and posted at the door of the courthouse of the county or corporation on the first day of the term next preceding the application.” § 7. “ tenant of the freehold,” as here used, means tenant in possession, appearing as the visible owner. Such was held to be the meaning of the word “proprietor,” in Pitzer v. Williams, 2 Bob. B. 241. The proceeding in that case was to condemn land for the abutment of a dam, proposed to be made by a person desiring to build a machine useful to the public. “Bo man’s property” (says Judge Allen, in whose opinion the other judges concurred), “ should be taken without just compensation. The law provides the mode by which that compensation is to be ascertained, leaving it to the ap *512 plicant to pay to the party entitled at his peril. Unless this were so, land for public improvements or other necessary public purposes, could not he con-clemne(l where the owner was unknown; and thus enterprises of great utility might he arrested for this cause. This law itself merely requires notice to proprietor or his agent, when found in the county; hut the land of any person may he condemned, no matter whether he he found in the county or not; and when it is so condemned, and the money is paid to the party entitled, the applicant becomes seized in fee simple. This proves that, in the contemplation of the Legislature, it was not essential that the true owner should he a party to the proceeding by which he is divested of the fee for purposes of this' character; that where notice can readily be given, it should he done; hut whether it be given or not, a just compensation should he secured to him. I think, therefore, that notice to the tenant in possession as the visible owner was sufficient.” These observations apply with increased force to this case, in which the object was to condemn land for the purpose of erecting thereon a court-house, clerk’s office and jail. The 8th section of the chapter before referred to requires the day for the meeting of the freeholders to be designated in the order appointing them. The 9th section requires them to take an oath before executing their duties, and requires it to he certified in a prescribed form. The 10th section requires them, after viewing the land and hearing such proper evidence as either party may oiler, to ascertain what will he a just compensation for the said land, and for the damages to the residue of the tract, beyond the peculiar benefits to he derived in respect to such residue from the work to he constructed, and to make report in substance as prescribed in the said section. The 11th section provides that the said report and the certificate of the justice shall he forthwith returned to *513 the court; “and unless good cause he shown’ against the report the same shall he confirmed and recorded. The sum so ascertained to he a just compensation may he paid to the persons entitled thereto, or into court. Upon such payment, the title to that part of the land for which such compensation is allowed shall he absolutely vested in the company, county or town, in fee simple,” &c. When the owner is known, and at hand, and under no disability, the money will generally he paid to him. But when he is not known, or absent, or under a disability, or there is any controversy about the title, the money will he paid into court; and in either case a good title is thereby acquired. The 12th and 13th sections are as follows:
“12. If, however, good cause he shown against the report, or if the commissioners report their disagreement, or if they fail to report within a reasonable time, the court may, without further notice, as often as seems to it proper, appoint other commissioners; and the matter may he proceeded in as before prescribed.
“13. Whether any such new appointment he made or not, the company, county or town, on paying into court the sum ascertained by the previous report, may, notwithstanding the pendency of proceedings, enter into and construct their work upon or through that part of the land described in such previous report. Andno order shall he made, nor any injunction awarded by any court or judge, to stay the proceedings of the company, county or town, in the prosecution of their work, unless it he manifest that they, their officers, agents or servants, are transcending their authority, and that the interposition of the court is necessary to prevent injury that cannot he adequately compensated in damages.”
The latter of these two sections plainly expresses the intention of the Legislature, that the proceedings therein referred to are not to be delayed or obstructed *514 by litigation or otherwise without the greatest necessity. And in The James River and Kanawha Company v. Anderson and others, 12 Leigh 278, it was unanimously held by this court that it is not competent to a court of chancery to award an injunction to stay the proceedings of the company in the prosecution of its works of any kind, unless it be manifest, both that it is transcending the authority given by its charter, and that the interposition of the court is necessary to prevent injury that cannot be adequately compensated in damages. The two circumstances must concur, to warrant a court in awarding such process. The observations of Tucker P. and Allen J. in that case are very emphatic, and apply with great force to the case we now have under consideration; but it is unnecessary to repeat them here. See, also, the case of The Tuckahoe Canal Co. v. The Tuckahoe Railroad Co., 11 Leigh 42, in which the same doctrine was held. The 14th and 15th sections provide for what is to be done in case of another report after the money reported to be due by a former one is paid into court. The 16th, being the last section of the series referred to, is as follows:
“To enable the court to dispose properly of any money so paid into court, it may have enquiries by a commissioner, to ascertain what persons are entitled, thereto, and in what proportions; and may make an order of publication, requiring all interested to appear before the commissioner, that their respective claims may be passed upon. After such reference to a commissioner and such publication, the court shall make such disposition of the money so paid into court as may seem to it right.”
We see here what careful provision is made by law to secure the payment of the money into the proper hand to receive it; and it can rarely if ever happen that the money will be paid into improper hands. Should it so happen, however, the only consequence *515 ■could be that the company, county or town seeking to have a condemnation of the land, might have- to pay ■for it over again. There would be no danger of losing •the buildings or works constructed on the land, or of being delayed in the construction of the work The ■claim of the owner, at most, would only be for the 'value of the land without the works; to which value he might be entitled on the ground that private property cannot betaken for public uses without just compensation to the owner. Whether he would be so entitled, under such circumstances, is a question which does not arise, and is not intended to be decided here.
And now we come to that part of the question we have under consideration at present, which is, had the defendants in this cause a right to appear and show ■cause against the confirmation of the report, as they proposed to uo ?
The board of supervisors of Culpeper county, having selected two acres of land .in the town of Culpeper, belonging, as they say, to Eliza T. C. Jameson and •others, for the purpose of having the public buildings of the county erected thereon; and finding it necessary • to have the same condemned for that purpose, according to law; proceeded accordingly, after giving due notice to the said alleged owners, to have five disinterested freeholders of the county appointed by the County court thereof, who, or any three of whom, being first duly sworn, were to go upon said land, on a designated day, and ascertain, faithfully and impartially, what would be a just compensation for so much thereof as was proposed to be taken by the county of Culpeper for its purposes, and make report to the court, according to law. Three of the said freeholders, accordingly, after being first duly sworn, went upon the said land, ascertained what would be a just compensation for so much thereof as was proposed to be taken as aforesaid, and, on the 9th of December, 1870, *516 made and returned a report of their proceedings, in which report the boundaries of the two acres of land proposed to be condemned as aforesaid, were specifically set out, and the sum of six hundred dollars was stated to be a just compensation for the land to the owners thereof. On the 20th day of January, 1871, on motion of the board of supervisors, to confirm and record said report, Joseph B. Gorrell and seven others, defendants in this cause, claiming to be citizens of the county of Culpeper, tax-payers and real estate owners-therein, moved said court to allow them to shew cause against the confirmation of said report, by filing 12 exceptions in writing for that purpose, which they exhibited. But the court being of opinion that they had no right to be heard in the said proceeding, overruled their said motion to be allowed to shew cause against said report, refused to allow said exceptions to be filed, confirmed the said report, and ordered the same to be recorded. But, on motion of said Gorrell and others, the said judgment was suspended for thirty days, to allow them to apply for an appeal from and supersedeas to the same.
The exceptions referred to are as follows :
1st. Because the hoard of supervisors of said county have no power to condemn private property, or to ask for a condemnation of the same.
2nd. Because the County court of Culpeper have no-power, at the instance of the said board of supervisors, to condemn private property.
3rd. Because the tenants of the freehold of said two acres of land mentioned in said report of said commissioners, had no notice of the application of said board of supervisors to said County court to appoint commissioners to condemn said two acres of land. The said two acres of land, formerly belonged to said John Jameson, who, by deed dated the day of , conveyed the tract of land, embracing said two acres, *517 to William Major and William Emerson, upon certain trusts therein specified. Said deed is duly recorded in the clerk’s office of the County court of Culpeper, an office copy of which is herewith filed, to prove that •said Eliza T. C. Jameson, Philip L. Jameson, in his own right, and as committee of John Jameson, and John W. Jameson, are not tenants of the freehold.
4th.. Because Eliza T. C. Jameson, Philip L. Jame-son, in his own right, and as committee of John Jame-son, and John W. Jameson, have no legal title whatsoever to said two acres of land, as is shewn by said deed mentioned in third exception.
5th. Because, by the decree of the Circuit court of Culpeper, made in the chancery suit now pending in said court, of Major’s ex’ors v. Jameson and others, the said two acres of land, together with the tract of land ■of which it is a part, was decreed to be sold to satisfy a debt due from the said trust estate to tbe estate of said William Major, trustee, amounting to about $20,000. The beneficiaries in the estate of said William Major are John C. Major, Thomas B. Halle and Columbiana his wife, in right of said Columbiana, and Eliza T. C. Jameson, and William Major, whose interest has been vested in Lewis E. Higby, his assignee in bankruptcy, subject to liens theretofore acquired.
6th. Because the said Couuty court cannot divest the said Circuit court of Culpeper of its jurisdiction over said property; the latter having taken jurisdiction and entered decrees in said suit for a sale of said property; which decree of sale has been enjoined at the instance of said Philip L. Jameson.
7th. Because said two acres of land are not sufficiently described in said report.
8th. Because it does not appear, by any of the proceedings, that said board of supervisors could not agree on the terms of purchase with those entitled to said two acres of land, or that it made any effort to *518 purchase said two acres of land from those entitled thereto.
9th. Because it appears on the face of the order of the 80th of November, 1870, appointing said commissioners, that parties interested in said two acres of land, and not the tenants of the freehold, had legal notice of said motion.
10th. Because the said commissioners did not take the oath prescribed by law before proceeding to ascertain a just compensation for said two acres of land.
11th. Because the said two acres of land are wholly unfit for their said purposes, to wit: the erection of a courthouse and other buildings.
12th. Because the assessment of six hundred dollars as just compensation for said two acres of land is excessive.
There is nothing in any of the said exceptions to* show, nor is it pretended, that thefparties on whom the-notice was served were not in actual possession of the land, and the only persons in such possession; in which, case they were, as we have seen, tenants of the freehold within the meaning of the law, on whom it was proper to serve the notice. Nor is there anything in the said exceptions to show, nor is it pretended, that the exceptants, or any of them, had any interest whatever in the land sought to be condemned; nor that any person who had any interest in, or title to the land, legal or equitable, was opposed to its condemnation or-to the confirmation of the said report. From what has already been said, it must therefore be manifest that' the said exceptants had no right to become parties to-the said proceedings and file the said exceptions; that the said county coutt had no jurisdiction to receive* and decide upon the said exceptions; and that the said court was right in overruling the motion of said ex-ceptants to be allowed to show cause against the said report, and refusing to allow said exceptions to be filed- *519 And this brings us to the consideration of the next question arising in the case, which is,
3H. Had the Circuit court of the county of Culpeper jurisdiction to award to the said exceptants a writ of error and supersedeas to the judgment of the county court of said county, for the condemnation of the said two acres of land for the use of said county, as aforesaid?
”We are of opinion that the Circuit court had not such jurisdiction, and for two reasons: 1st, because the said exceptants were not parties to the said judgment nor to'the proceedings in which it was rendered; and, 2dly, because the nature and object of said proceeding, and the policy and provisions of law concerning it, forbid that a supersedeas should be awarded in such a case.
1st. It is well settled that a person who is not a party to the proceeding in which the judgment of the court below complained of was rendered, cannot obtain a supersedeas to such judgment. The word “person,” in the law giving the right to obtain an appeal, writ of error, or supersedeas, has been construed to mean “party;” and the word “party” is, itself, also used in that law: “Any person who is a party to any case” is a part of the language of that law. Acts of Assembly 1869-’70, p. 221, § 2; 1 Rob. Prac., old edition, pp. 656, 657; and the cases cited, especially Sayre v. Grymes, 1 Hen. & Mun. 404; and Wingfield v. Crenshaw, 3 Hen. & Mun. 245. Holcomb v. Purcell, &c., decided by this court in 1802, and referred to in 1 Rob. Pr. supra, is, as that author truly says, a strong case upon this head. “In that case the court held that a principal obligor in a forthcoming bond, against whom the judgment in the original suit was rendered, but against whom no judgment was rendered on the forthcoming bond, was not entitled to appeal from a judgment against a surety in the forthcoming bond. Upon the face of the record *520 it must have appeared that the principal obligor was collaterally interested, since the surety would be entitled to recover of him the amount of the judgment wheneyer surety should discharge the same; but not being immediately a party to the judgment, the court dismissed the appeal.” Id. p. 656. A person must n0^ on]y kg a forty to the proceeding in the court below, but he must also be aggrieved by the judgment rendered therein, to entitle him to obtain a supersedeas to such judgment: The two circumstances must concur. Id. p. 657.
Here the persons who obtained the supersedeas to the judgment of the county court were’not parties to the proceeding in which that judgment was rendered. Hor would they have been proper parties, as has already been shown. ■ They proposed to show cause against the confirmation of the report, and to file certain exceptions thereto for that purpose; but the court properly refused to permit them to do so.. They were not, therefore, parties to the judgment; nor were they aggrieved thereby. They had not such an interest in the object of the proceeding as entitled them to be parties. It was a mere enquiry, ad quod damnum,; a proceeding to ascertain the value of certain land in which they had no interest whatever. Any indirect interest they may have had in the subject as citizens, tax-payers, and landholders of the county, was not sufficient to make them proper parties. They did not become parties by merely offering to become so, when that offer was rejected. If they became parties to anything, it was merely to the order of rejection; and not to the order confirming the report. And their supersedeas, if they were entitled to any, would only be to the said order of rejection, and not to the said order of confirmation. But they were not entitled to a supersedeas to the former order, for they were not aggrieved thereby. The order of the County court, made after the rendition of *521 the judgment, suspending it for thirty days to allow the exceptants to apply for an appeal and supersedeas, did not make them parties to the proceeding in the County court. To give it that effect would he to make the court do, indirectly, what it had just before expressly refused to do.
2dly. The object of the proceeding was merely to asceitain the value of land required by public necessity. The immediate possession of the land was necessary for the public use; and the policy and provisions of the law require that the public should not he unnecessarily or improperly delayed or obstructed in taking or holding possession of the land. On this ■subject enough has already been said; and what has been said need not be here repeated. If this hoard of supervisors have done any wrong; if they have been .guilty of any fraud, or abused their trust, or are doing, or about to do, anything to the injury of the county or ■any of its citizens, persons thereby aggrieved must seek for any redress to which they may be entitled in •some other form of proceeding than that which has been pursued by the defendants in this case. The law •expressly declares, in regard to proceedings for the •condemnation of land for the public use, that no order shall he made, nor any injunction awarded by any ■court or judge to stay the proceedings of the company, county or town in the prosecution of their work, unless it he manifest that they, their officers, &c., are transcending their authority, and that the interposition of the court is necessary to prevent injury that cannot he adequately compensated in damages. Both of these two things, we have seen, must concur, to render such •an order or injunction proper; and we think that neither exists in this case. To allow a supersedeas in such a case, therefore, the effect of which might he to •delay indefinitely the execution of a work of immediate public necessity, would be a direct violation of an *522 express mandate of the law. We therefore think the Circuit court had no jurisdiction to award the said • writ of supersedeas. And now we come to the next, enquiry, which is,
IV. Whether prohibition is the proper remedy in such a case as this.
A prohibition is a proper remedy to restrain an inferior court from acting in a matter of which it has no jurisdiction, or from exceeding the bounds of its jurisdiction. A Circuit court cannot review a judgment of a County court except in the cases and in the mode prescribed by law. If a Circuit court, ex mero motu, undertake to review a judgment of a County court, it is an act of usurpation for which prohibition lies; so, if a Circuit court undertake to review such a judgment on the petition of one who is not a party to it, the same remedy lies. A writ of error or supersedeas cannot be awarded on the petition of an amicus curiae. Dunlop v. The Commonwealth, 2 Call. 284. It can only be awarded on the petition of a party thereto who is aggrieved thereby, or his representative. We have seen that the writ of error and supersedeas complained of in this case was awarded on the petition of persons who were not parties to the judgment superseded, nor aggrieved thereby. It follows, therefore, that prohibition is the proper remedy in the case. That a writ of error or supersedeas would lie to a judgment of the Circuit court in the case, does not show that prohibition does not also lie. They may be concurrent remedies; but certainly the remedy by prohibition is the better one in such a case as this. It prevents the mischief' before it is done, and avoids the great evil (which the law has so carefully sought to prevent) of the delay and interruption of a necessary public work. And now we come to the last enquiry, which is,
V. Whether it is necessary for the plaintiff to file a *523 declaration in this case, the respondents insisting upon their alleged right to have one filed?
' It certainly seems to he settled, at least as a general rule, both in England and in this country, that a writ of prohibition will not be awarded without first requiring the plaintiff (if the defendant insist upon it) to file a declaration. 7 Comyn’s Dig. Prohibition I; Remington v. Dolby, 2 Q. B. 176, 58 Eng. C. L. R. 174, 178; Arnold v. Shields, 5 Dana’s R. 18; Mayo, mayor v. James, 12 Gratt. 17, 24. The reason for that rule, in its origin, is well stated thus in 3 Black. Com. p. 113 : “ Sometimes the point may be too nice and doubtful to be decided merely upon a motion: and then, for the more solemn determination of the question, the party applying for the prohibition is directed by the court to declare in prohibition; that is, to prosecute an action, by filing a declaration, against the other, upon a supposition or fiction (which is not traversable), that he has proceeded in the suit below, notwithstanding the writ of prohibition. And if, upon demurrer and argument, the court shall finally be of opinion that the matter suggested is a good and sufficient ground of prohibition in point of law, then judgment, with nominal damages, shall be given for the party coinplaining, and the defendant, and also the inferior court, shall be prohibited from proceeding any farther.” The Code, p. 658, ch. 155, while it recognizes the propriety or necessity of a declaration in some cases, simplifies the form of it, and strips the subject of the fictions which were incident to it at common law. It is manifest that the main object of the rule requiring a declaration, is to put the very point in issue on record, so that the decision of the court upon it may, if necessary, be reviewed by an appellate court. That reason applies to cases of prohibition arising in an inferior court; where they all arose at common law, and, until recently, in this State. "We mean, by inferior court, any *524 court lower than the highest appellate court. In England, the House of Lords is the highest appellate court, but it has no original jurisdiction in a case of prohibition. The courts at Westminster Hall have original jurisdiction in such a case, and an appeal lies from their decision to the House of Lords. But no appeal lies from a decision of this court to any other, even in a case decided by this court in the exercise of its original jurisdiction. There is not, therefore, the same reason or necessity for a declaration, in a case of prohibition in this court, as in such a case in an inferior court. We will not say that a declaration is never necessary or proper in a case of prohibition brought originally in this court. We only mean to say that there is not the same necessity or propriety for it in this as in other courts. It would certainly be not only unusual, but inconvenient, to have a case prosecuted here by declaration and other pleadings, and triable by the court on demurrer, and by a jury on issues of fact. And where there is no necessity for such a mode of proceeding, and no possible benefit to be derived from it, we think it may properly be dispensed with. How, here the facts on which we decide this case are undenied and undeniable: being in fact matters of record ; and no good purpose can possibly be attained by requiring a declaration. On the contrary, it would be attended with expense and trouble to the parties, and produce delay, which in such a case is a very great evil, only to be encountered when it is necessary, or for the purpose of avoiding a greater evil. A declaration in a case of prohibition is required by the statute to “ set forth, in a concise manner, so much only of the proceedings as may be necessary to shew the ground of the application.” The petition fully does that, and more fully perhaps than would be required in a declaration. A declaration in this case, repeating the very words of the petition, would no doubt be *525 held sufficient: It would be the vainest thing in the world, therefore, to require a declaration; and the most that could be proper would seem to be to order the petition to be treated as a declaration. But there is no necessity for that. The defendants, or such of them as have chosen to do so, have fully answered the petition; and the parties on both sides have been fully heard by counsel on the merits. Ve are of opinion, therefore, that the plaintiffs ought not to be required to file a declaration in this case.
Upon the whole, we are of opinion that a writ of prohibition be awarded, according to the prayer of the petition.
The order of the court was as follows:
The court, for reasons stated in writing and filed with the record, is of opinion:
1st. That'the board of supervisors of the county of Culpeper have power, under the constitution and laws of the State, to acquire land in the town of Culpeper, for the erection thereon of a court-house, clerk’s office, and jail, and to have the said land condemned for that purpose, in the mode prescribed by the Code, chapter 56, sections 6-16, pages 324-326.
. 2d. That the County court of said county properly overruled the motion of the said Joseph B. G-orrell and others to be allowed to show cause against, and file exceptions to, the report of the commissioners appointed by the said court to ascertain a just compensation to the owners of the land proposed to be taken by the said board of supervisors for the purpose aforesaid.
3d. That the said Henry Shackelford, judge of the Circuit court of said county, had no authority to award to the other defendants a writ of error and supersedeas to the judgment of the County court of said county, condemning the said land for the purpose aforesaid; and the said Circuit court has no authority to entertain *526 jurisdiction of the said writ of error and supersedeas.
4th. That prohibition is the proper remedy for the plaintiffs in such' a case as this; and,
5th. That it is not necessary for them to file a declaration in the case.
Therefore, it is adjudged and ordered that the said motion to discharge the said rule be overruled, and that a writ of prohibition be awarded, according to the prayer of the said petition, directed to the said defendants, commanding them to proceed no further upon the writ of error and supersedeas, awarded by the said Henry Shackelford, judge as aforesaid, in favor of the other defendants, to a judgment of the County court of said county, obtained on the 20th day of January, 1871, by the said board of supervisors, against Eliza T. C. Jameson and others, for the condemnation of two acres of land for the use of said county; and superseding the said writ of error and supersedeas, and all proceedings which have been had under the same. And it is further adjudged and ordered that the service of an office copy of this order upon the said defendants shall have the same force and effect as the execution upon them of a writ of prohibition, issued in pursuance hereof. And it is further adjudged and ordered that the plaintiffs recover against the defendants, except the said Henry Shackelford, judge as aforesaid, their costs by them expended in the prosecution of this proceeding.
Which is ordered to be certified to the said Circuit court of Culpeper county.
Writ or prohibition awarded.